1    EDMUND G. BROWN JR.
     Attorney General of the State of California
2    DANE R. GILLETTE
     Chief Assistant Attorney General
3    GERALD A. ENGLER
     Senior Assistant Attorney General
4    GREGORY A. OTT
     Deputy Attorney General
5    ALLEN R. CROWN
     Deputy Attorney General
6    State Bar No. 56818
       455 Golden Gate Avenue, Suite 11000
7      San Francisco, CA 94102-7004
       Telephone: (415) 703-5847
8      Fax: (415) 703-1234
       Email:  Allen.Crown@doj.ca.gov
9
     Attorneys for Respondent
10

11                IN THE UNITED STATES DISTRICT COURT

12            FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                        SAN JOSE DIVISION

14

15   **MICHAEL DAVID GUTIERREZ,**              C 07-3668 RMW (PR)

16                            Petitioner,

17        **v.**

18   **JAMES A. YATES, Warden,**

19                            Respondent.

20

21       **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER**

22

23

24

25

26

27

28

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  GREGORY A. OTT
   Deputy Attorney General
5  ALLEN R. CROWN
   Deputy Attorney General
6  State Bar No. 56818
     455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-7004
     Telephone: (415) 703-5847
8  Fax: (415) 703-1234
     E-mail:  Allen.Crown@doj.ca.gov
9
   Attorneys for Respondent
10

11            IN THE UNITED STATES DISTRICT COURT

12           FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                    SAN JOSE DIVISION

14

15  **MICHAEL DAVID GUTIERREZ,**              C 07-3668 RMW (PR)

16                            Petitioner,     **MEMORANDUM OF POINTS
                                              AND AUTHORITIES IN**
17      **v.**                                **SUPPORT OF ANSWER**

18  **JAMES A. YATES, Warden,**

19                            Respondent.

20

21                    **INTRODUCTION**

22          California state prisoner Michael David Gutierrez  has filed a petition for writ of habeas

23  corpus in this Court raising the following federal constitutional claims:  one, petitioner's federal

24  constitutional right to due process was violated when the trial court improperly allowed the

25  testimony that Mr. Lionetti had identified petitioner in person, in a one-person show up at the

26  hospital, which was erroneously admitted over objection in violation of his right to confrontation;

27  two, petitioner's federal constitutional right to due process was violated when the trial court erred

28  in excluding evidence which provided an alternative reason for petitioner to avoid contact with the

1    police on January 7, 2004; and three, the cumulative errors were prejudicial.

2                            **STATEMENT OF THE CASE**

3              On June 16, 2004, the District Attorney filed an information in Santa Clara County

4    Superior Court accusing petitioner, Michael David Gutierrez, as follows:  count one, carjacking

5    where the victim is the driver in violation of California Penal Code § 215[1/] with enhancements for

6    personal use of a deadly weapon within the meaning of § 12022(b)(1), and personally inflicting great

7    bodily injury within the meaning of §§ 12022.7 and 1203(e)(3); count two, assault with a deadly

8    weapon in violation of § 245(a)(1), with enhancements for personal use of a deadly weapon within

9    the meaning of §§ 667 and 1192.7 and personally inflicting great bodily injury within the meaning

10   of §§ 12022.7(a) and 1203(e)(3).  It was further alleged that petitioner had been previously

11   convicted of two felonies for which he had served separate prison terms within the meaning of §

12   667.5(b), including one of which was a violent or serious felony within the meaning of §§ 667.5(c)

13   and 1192.7(c), and a serious felony within the meaning of §§ 667.5(a) and 1192.7.  1 CT 9-13.

14             On November 23, 2004, a jury returned verdicts of guilty and found the allegations of

15   weapon use and infliction of great bodily injury to be true.  1 CT 147-51.  Both parties waived their

16   rights to a jury trial of the prior-conviction allegations.  1 CT 151.

17             On December 6, 2004, the District Attorney's motion to dismiss the prior-conviction

18   allegations under § 667.5 was granted, and the court found the remaining prior-conviction

19   allegations to be true.  1 CT 154.

20             On February 17, 2005, the court sentenced petitioner to state prison for a term of twenty-

21   six years, consisting of eighteen years for double the upper term for count one, plus three years for

22   the great-bodily-injury enhancement, plus five years for the prior-conviction enhancement.  A

23   sentence of six years for double the midterm for count two was imposed concurrently.  1 CT 233-35.

24             On November 20, 2006, the California Court of Appeal, Sixth Appellate District, affirmed

25   the judgment.  Exh. F.

26             On February 7, 2007, the California Supreme Court denied petitioner's petition for review.

27   _____

28        1.  Unspecified statutory references are to the California Penal Code.

1  Exh. H.

2        On July 17, 2007, petitioner filed a petition for writ of habeas corpus in this Court.

3        On February 12, 2008, this Court issued an order to show cause.

4  **STATEMENT OF FACTS**[2]

5  **Prosecution Evidence**

6        On January 7, 2004, in the early morning hours, Anthony Lionetti was flagged down at

7  a gas station as he drove his taxicab down Fruitdale from the 7-Eleven near the corner of Bascom

8  and Fruitdale in San Jose.  The man got into the taxicab and said that he wanted to go King and

9  McLaughlin.  1 RT 64.  The man was Hispanic, appeared to be in his late twenties, and was wearing

10  a checked shirt over a T-shirt with jeans.  He had not shaved in a couple of days.  1 RT 66-67.

11  Lionetti drove the taxicab to McLaughlin, but the fare said to drive to Virginia.  Lionetti was

12  suspicious because Virginia is a dead-end street and it was the middle of the night.  1 RT 68.

13  Lionetti stopped the taxicab in front of the first house past the corner of King and Virginia.  When

14  the taxicab stopped, the fare got out and urinated on a tree.  Lionetti got out of the taxicab, walked

15  over to the fare, and asked for his money – around eighteen or nineteen dollars.  1 RT 69, 73-74.

16        Lionetti called his dispatcher on his cell phone in a scared voice to report that he was in

17  trouble and needed police and an ambulance.  The dispatcher heard a thumping sound, and the phone

18  went dead.  The dispatcher called 911.  The fare had gotten into the taxicab and driven it over

19  Lionetti.  1 RT 49-51, 75-79.  The fare drove the taxicab towards the end of the street, got out of the

20  taxicab, and ran down an alley in the direction of his relative's house.  1 RT 79.

21        Officer Mizuhara and his partner were dispatched at about 12:10 a.m. on January 7, 2004,

22  to the corner of King and Virginia.  They found Lionetti lying face down in the street.  Lionetti was

23  fully awake, was complaining of extreme pain, thought he might die because of his injuries, and was

24  very angry that his taxicab had been taken.  1 RT 124-126, 131-32.  Within a few minutes of

25  arriving, Officer Mizuhara asked Lionetti what happened to him, what he did for a living, and who

26  did this to him.  They talked for about ten minutes, until medical personnel arrived.  Lionetti's

27  

28        2. The state Court of Appeal's summary of the facts is set forth at Exh. F, 2-3.

Memorandum of Points and Authorities in Support of Answer - *Gutierrez v. Yates*, C 07-3668 RMW (PR)

answers totally made sense.  1 RT 80, 126-127, 129-30.  Lionetti said that he was a cab driver, that he picked up a fare near the corner of Bascom and Fruitdale, and that the fare wanted to go to the area of King and Virginia.  The fare was an Hispanic male, about thirty, named Mike, wearing a Pendleton shirt and blue jeans, and having about three days' growth of beard.  Officer Mizuhara broadcast the description to fellow officers.  1 RT 134-38.  Officer Mizuhara asked how Lionetti was injured.  Lionetti explained that the fare got out of the taxicab and tried to leave, but Lionetti got out of the taxicab and confronted him about the money.  The fare pulled out a folding knife, like a switchblade.  The fare backed away toward the open taxicab door, quickly got into the cab, and drove away.  Lionetti was struck on his left side by the taxicab.  Lionetti said that he could identify the fare.  1 RT 138-43.  The taxicab was found about a block away from Lionetti with the driver's door open and nobody inside.  1 RT 145-46.

Lionetti arrived at San Jose Medical Center by paramedic ambulance at about 1 a.m. on January 7, 2004.  He had abrasions on his chest and both legs, and he was complaining of pain in his right chest.  2 RT 375-76.  He was given moderate amounts of morphine sulfate and Toradol to control his pain so that he could lie still and cooperate in treatment by providing accurate information.  The treating physician did not notice anything to suggest that Lionetti was experiencing hallucinations, blurred vision, or memory deficit.  Lionetti passed a test for memory deficit with the same standard as would apply to his treating physician or the prosecuting attorney.  2 RT 379-86, 388-89.  An examination indicated that Lionetti suffered at least a broken rib.  The following day it was determined that he had suffered a broken clavicle and broken ribs.  His complaints of pain were accurate.  2 RT 297, 376-77, 385.

While physicians were treating Lionetti between 1 and 2 a.m. on January 7, 2004, Officer Lem spoke to him.  Lionetti was in a lot of pain, but his responses made sense and were consistent with his prior description of the event.  1 RT 207-09.  Lionetti described picking up the fare near Bascom and Fruitdale, driving him in the taxicab down Virginia to King.  When Lionetti stopped, the fare got out and urinated against a tree.  Lionetti got out of the taxicab and asked the fare for the money.  The fare pulled out a knife and jumped into the taxicab.  As Lionetti confronted the fare with the driver's door open, the fare backed up the taxicab and door knocked Lionetti down.  After

1    the taxicab backed over Lionetti, he rolled to the side before the fare drove the taxicab forward and

2    down the street.  1 RT 210, 212-16.  Lionetti described the fare as an Hispanic male, about thirty,

3    wearing a multi-colored flannel shirt and blue jeans, with a three-day growth of stubble.  The fare

4    acted in a bizarre manner, like he was high on drugs.  1 RT 82-83, 211.

5         Sergeant Overstreet noticed similarities, between the description that Lionetti gave of the

6    suspect at the scene and at the hospital, to another suspect who had eluded officers the day before

7    named Michael Mestez.  A six-photo lineup containing Mestez's photo, but not petitioner's photo,

8    was assembled and shown to Lionetti at about 2 a.m. in the emergency room.  Lionetti said right

9    away that he did not recognize anybody in the photo lineup.  1 RT 84-87, 235-36, 240-43, 248-49;

10   2 RT 416.

11        Petitioner's sister, Denise Garduno, testified that petitioner arrived at her brother's

12   residence during the early morning hours of January 7, 2004, looking for a place to stay.  When told

13   that he could not stay there, petitioner was not in a very good mood.  He pulled out the folding-blade

14   knife and had it in his hand.  Ms. Garduno called 911 at 2:17 a.m. because she was afraid that

15   petitioner would hurt her brother, Joseph Garduno, or himself.  2 RT 340-44, 353, 451, 457.

16   Petitioner was wearing a Pendleton shirt, was unshaven, and was thirty-eight years old.  2 RT 346,

17   456.  Ms. Garduno did not think that petitioner had any money because she gave him a dollar.  2 RT

18   353.  There was a commotion with ambulances and sirens at the corner.  Petitioner was acting

19   nervously when a police car drove by.  He went behind a parked car, although he may have tripped

20   rather than trying to avoid the police. 2 RT 347-48, 449-50, 459, 462.  Ms. Garduno was afraid that

21   the police might harass petitioner and beat him up again.  2 RT 452.

22        Police arrived in response to Ms. Garduno's 911 call, talked to her, and arrested petitioner.

23   Officer Yu, who had initially responded to the Lionetti carjacking, responded to the dispatch

24   regarding Ms. Garduno's 911 call at about 2:18 a.m.  Ms. Garduno initially implied that she did not

25   make the 911 call, but soon told Officer Yu that she had called.  She said that when petitioner

26   arrived, he was acting strangely and looking for a place to stay.  When she refused to let petitioner

27   stay at the residence, he asked for a ride out of the area.  2 RT 340, 392-93, 395, 403-05.  Petitioner

28   came out of the residence at about 2:56 a.m. wearing a flannel shirt over a white T-shirt and blue

1   jeans. He had a folding knife in his pocket. 1 RT 163-67. The folding knife taken from petitioner

2   had a push button that could be held with the thumb, allowing the knife to be flipped open with one

3   hand. 1 RT 153-54, 168. Petitioner had at least a day's growth of stubble, and his demeanor was

4   bizarre with a non-responsive stare. 1 RT 168-72.

5          At about 3:14 a.m., petitioner was taken to the emergency room where Lionetti

6   immediately identified petitioner as his assailant. Lionetti said that was him, remarked on

7   petitioner's face and clothes, and said he was sure that petitioner was the man who stole his taxicab.

8   1 RT 218, 223, 244-45.

9          At about 9:30 to 9:45 a.m., Lionetti also told David Logan, the Operations Manager for

10  the cab company, the truth about what happened. Lionetti was very talkative and interactive, just

11  as he had always been during the eight years that Logan had known him. 1 RT 93-94, 181-83, 187-

12  88. Logan testified that Lionetti gave him a good narrative of what had happened, answered

13  clarifying questions, and did not say he did not remember. 1 RT 189. Lionetti said that after he

14  stopped the taxicab and the fare urinated against the tree, Lionetti got out of the taxicab, went up to

15  the fare, and asked if he was going to get paid. The fare pulled out a knife, waived it at Lionetti,

16  went and got inside the taxicab, started the engine because Lionetti had left the key in the ignition,

17  and put the car in reverse. Lionetti was unable to get out of the way as the fare tried to run over him.

18  As the taxicab came in reverse, the driver's door was open, it caught Lionetti, and it knocked him

19  down on the ground and dragged him back several feet. 1 RT 192-93. The fare put the taxicab in

20  drive, drove forward, and tried to run over Lionetti a second time. The driver's door hit him and

21  swung shut, as the fare took off with the taxicab. Lionetti was not searching for details or failing

22  to recall, but was totally coherent. Lionetti talked about how quickly the police, ambulance, and

23  paramedics responded and about how the police had brought the suspect to the emergency room so

24  that Lionetti could identify him. Lionetti described the suspect as Hispanic. Logan asked Lionetti

25  if he was sure it was the guy. Lionetti said yes, it's definitely the guy and that he was sure that the

26  person the police brought to the hospital room was the person who did it. 1 RT 194-95.

27         Lionetti developed breathing difficulties due to bleeding in his chest. Late in January or

28  early in February 2004, he was sedated and given psychotropic medication to induce a coma so that

Memorandum of Points and Authorities in Support of Answer - *Gutierrez v. Yates*, C 07-3668 RMW (PR)

1   he could endure the treatment he received.  When he regained consciousness months later, his short-

2   term memory was affected.  2 RT 298-305.  By the time of trial he could remember much of what

3   happened to him on January 7, 2004.  Lionetti was truthful, accurate, and honest in recounting the

4   events at the scene and at the emergency room that night.  He remembered that he had identified his

5   assailant at the emergency room, but could not identify petitioner as his assailant at trial.  1 RT 88-

6   93.        Fingerprints lifted from the taxicab did not match petitioner, Lionetti, any of the police

7   officers at the scene, or comparisons from the computer data base.  2 RT 419, 434-35, 466-70, 481-

8   83, 487-88, 491.  At 4:25 a.m. on January 7, 2004, a blood sample was taken from petitioner.  Upon

9   analysis, it was negative for illegal drugs, but revealed a blood alcohol level of .09 percent.  2 RT

10  415-16.

11            **Defense Evidence**

12            According to the medical records, Lionetti was admitted to the emergency room at 1:10

13  a.m.  At 1:20 a.m. he was given Tetanus vaccine and two milligrams of morphine sulfate.  At 1:30

14  a.m. he was given an additional two milligrams of morphine sulfate.  At 2 a.m. he was given an

15  additional four grams of morphine sulfate.  Thus, he was given a total of eight milligrams of

16  morphine sulfate in less than one hour.  He was also given thirty milligrams of Toradol, a pain

17  medication, at 2:18 a.m.  2 RT 321-23.  Possible side effects of morphine sulfate are constipation,

18  sensation of drunkenness, blurred or double vision, and disorientation.  2 RT 324, 331.  Side effects

19  for a patient such as Lionetti would be rare.  Nothing in the medical records indicates that Lionetti

20  suffered any side effects in the emergency room that night.  2 RT 331-32.

21                            **STANDARD OF REVIEW**

22            A federal court may grant a writ of habeas corpus to a state prisoner only if the state

23  court's rulings "resulted in a decision that was contrary to, or involved an unreasonable application

24  of, clearly established Federal law, as determined by the Supreme Court of the United States" or

25  were "based on an unreasonable determination of the facts in light of the evidence presented" in the

26  state courts. 28 U.S.C. § 2254(d).  Under the "contrary to" clause, a state court decision is contrary

27  to federal law if it "contradicts the governing law set forth in our cases" or if it "confronts a set of

28  facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at

1  a result different from our precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *see also*

2  *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). That test does "not require citation of our cases

3  – indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the

4  result of the state-court decision contradicts them." *Early,* at 8.

5          The ultimate controlling authority is the holding of the Supreme Court's cases at the time

6  of the relevant state-court decision, not the dicta. *Williams v. Taylor*, 529 U.S. at 412. The state

7  courts are presumed to "know and follow the law," and the standard for evaluating state-court

8  rulings, which are given the "benefit of the doubt," is "highly deferential." *Woodford v. Visciotti*,

9  537 U.S. 19, 24 (2002) (per curiam). "A federal court may not overrule a state court for simply

10  holding a view different from its own, when the precedent from this Court is, at best, ambiguous."

11  *Mitchell v. Esparza,* 540 U.S. 12, 17 (2003). In other words, "[i]f no Supreme Court precedent

12  creates clearly established federal law relating to the legal issue the habeas petitioner raised in state

13  court, the state court's decision cannot be contrary to or an unreasonable application of clearly

14  established federal law." *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004).

15          In order to warrant habeas relief, the state court's application of clearly established federal

16  law must be not merely erroneous, incorrect, or even "clear error," but "objectively unreasonable."

17  *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003); *see also Williams v. Taylor*, 529 U.S. at 409; *Woodford*

18  *v. Visciotti*, 537 U.S. at 24. It is the habeas petitioner's burden to make that showing. *Woodford*,

19  at 25. In the same way, a "decision adjudicated on the merits in a state court and based on a factual

20  determination will not be overturned on factual grounds unless objectively unreasonable in light of

21  the evidence presented in the state-court proceeding." *Miller-El v. Cockrell,* 357 U.S. 322, 340

22  (2003). State court factual determinations are presumed correct unless rebutted by clear and

23  convincing evidence. 28 U.S.C. § 2254(e)(1).

24          Harmless error review is no less exacting. An error can justify overturning the conviction

25  only if it had a "'substantial and injurious effect or influence in determining the jury's verdict.'"

26  *Penry v. Johnson*, 532 U.S. 782, 795 (2001), *quoting Brecht v. Abrahamson*, 507 U.S. 619, 637

27  (1993). The *Brecht* standard applies to all § 2254 cases, regardless of the type of harmless error

28  review conducted by the state courts. *Fry v. Pliler*, ___ U.S. ___, 127 S.Ct. 2321, 2328 (2007).

1    When there is no reasoned opinion from the highest state court to consider petitioner's

2    claims, the federal court looks to the last reasoned state court opinion. *See Ylst v. Nunnemaker*, 501

3    U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir. 2000).

4    Petitioner's claims, as identified below, fail as a matter of law under the AEDPA

5    standards.  The petition should accordingly be denied.

6                                    **CLAIM ONE**

7    **PETITIONER'S CLAIM OF VIOLATION OF HIS RIGHT TO CONFRONTATION IS WITHOUT MERIT**

8

9    In claim one, petitioner contends that his federal constitutional right to due process was

10    violated when the trial court improperly allowed the testimony that Mr. Lionetti had identified

11    petitioner in person, in a one-person show up at the hospital, which was erroneously admitted over

12    objection in violation of his right to confrontation.  This claim is without merit because petitioner

13    has failed to show that the state appellate court made an objectively unreasonable application of

14    clearly established United States Supreme Court precedent or that the state appellate court decision

15    was based upon an unreasonable determination of facts.

16    The United States Supreme Court has decided that "when the declarant appears for cross-

17    examination at trial, the Confrontation Clause places no constraints at all on the use of his prior

18    testimonial statements." *Crawford v. Washington*, 541 U.S. 36, 59, n. 9 (2004).  The state appellate

19    court also applied applicable Supreme Court precedent under *United States v. Owens*, 484 U.S. 554

20    (1988), which held that a witness's memory loss does not render him unavailable for cross-

21    examination for purposes of the Confrontation Clause.  The state appellate court used these

22    applicable Supreme Court precedents to determine that there was no violation of petitioner's

23    confrontation right because the declarant in this case testified at trial and was subject to cross-

24    examination.  Exh. F, 3-10.

25    Moreover, even if the victim's pretrial testimonial statements to police identifying

26    petitioner as the perpetrator were subject to exclusion under *Crawford*, the victim's similar

27    statements to Mr. Logan, his supervisor from a private business, were non-testimonial and did not,

28    therefore, come within the scope of the *Crawford* exclusion rule.  Because the victim's statements

1    to Mr. Logan was non-testimonial, any error in admitting the victim's nearly identical statements

2    to the officers identifying petitioner as his assailant is harmless under the *Brecht* standard.  The

3    testimony of Mr. Logan that victim was lucid and able to tell him about the incident, and that the

4    person the police showed him in the emergency room was the guy who did it, proved to be highly

5    credible and unrebutted evidence that petitioner committed the crimes.  Even if the testimony of the

6    officers about the victim's identification of petitioner had been excluded, Mr. Logan's testimony

7    would have resulted in petitioner's conviction.  The jury's decision would have been the same.

8            Finally, petitioner forfeited his Confrontation Clause right as to all of the victim's out-of-

9    court statements by his own wrongdoing in making the victim unavailable.  Petitioner's own

10   wrongdoing is an equitable bar to his objection on Confrontation Clause grounds to the admission

11   of the victim's hearsay statements.  *See Crawford v. Washington,* 541 U.S. at 62; *United States v.*

12   *Emery*, 186 F.3d 921, 926 (8th Cir. 1999); *United States v. Miller*, 116 F.3d 641, 667-68 (2d Cir.

13   1997).  "The law simply cannot countenance a defendant deriving benefits from murdering the chief

14   witness against him."  *United States v. Thevis*, 665 F.2d 616, 630 (5th Cir. 1982); *see also United*

15   *States v. Dhinsa,* 243 F.3d 635, 651-52 (2d Cir. 2001).  Petitioner should not be heard to complain

16   that he could not cross-examine the victim about his out-of-court statements when petitioner's own

17   criminal act made the victim unable to remember the details of his identification of petitioner.  To

18   the extent that petitioner argues that the doctrine of forfeiture does not apply here because the

19   evidence is consistent with his having inadvertently hit the victim with the taxicab door,  the victim

20   testified to the contrary that the carjacker intentionally tried to drive over him – and succeeded in

21   doing so.  1 RT 193-94.  Petitioner probably hoped that no witnesses beside the victim were

22   available, and intentionally tried to kill him or otherwise render him unavailable to identify

23   petitioner. While petitioner may not have foreseen the exact circumstances that disabled the victim's

24   memory, running over someone with a taxicab is definitely a way to try to interfere with both

25   memory and availability as a witness.  The forfeiture doctrine should apply in situations like this one

26   when the victim is the only apparent witness and the defendant's actions are likely to cause the

27   witness to be unavailable.  This Court should reject his claim and deny the petition.

28   ///

**CLAIM TWO**

**PETITIONER'S CLAIM OF DENIAL OF HIS RIGHT TO PRESENT A DEFENSE IS WITHOUT MERIT**

In claim two, petitioner contends that his federal constitutional right to due process was violated when the trial court erred in excluding evidence which provided an alternative reason for petitioner to avoid contact with the police on January 7, 2004. This claim is without merit because petitioner has failed to show that the state appellate court made an objectively unreasonable application of clearly established United States Supreme Court precedent or that the state appellate court decision was based upon an unreasonable determination of facts.

Petitioner's claim is based upon his Sixth Amendment right to presenting a defense to the charges against him pursuant to *Crane v. Kentucky,* 476 U.S. 683, 690 (1986) [the state must give a defendant the opportunity to present a defense by attacking his confession], and *Washington v. Texas,* 388 U.S. 14, 19 (1967) [the state must allow a defendant to present percipient witnesses to the alleged crime]. The state appellate court, without mentioning these cases in its decision, nevertheless followed their precedents in deciding that petitioner's right to present a defense was not violated. Exh. F, 10-13. Here petitioner was not denied the opportunity to call witnesses to the alleged carjacking, nor denied the opportunity to present a defense. Petitioner's defense was misidentification, that is, that somebody else did the crime. He presented evidence to support his claim that the victim was so medicated that he could not make a proper identification of petitioner in the emergency room.

Petitioner's sister, Denise Garduno, was not allowed to testify about her opinion as to whether petitioner was trying to avoid the police because officers had beaten him on a previous occasion. She was allowed to testify that she was not certain that petitioner was trying to avoid the police when they drove by that night. But she was not allowed to explain her answer. 2 RT 449-50. She testified on re-direct examination that she was afraid that petitioner might be harassed by the police and beat up again. 2 RT 452. Petitioner has failed to demonstrate that the state appellate court decision was contrary to clearly established federal law or that the state appellate court decision was based upon an unreasonable determination of facts.

1    Moreover, as explained above in response to petitioner's first claim, petitioner has failed

2    to show that he was prejudiced under the *Brecht* standard.  That is, petitioner has failed to show that

3    if his sister's opinion about his reason for avoiding the police – that they had previously beaten him

4    – had been admitted on cross-examination rather than on re-direct examination, then the jury's

5    decision would have been different.  This Court should reject his claim and deny the petition.

6                                              **CLAIM THREE**

7    **PETITIONER'S CLAIM THAT THE CUMULATIVE ERRORS WERE**
     **PREJUDICIAL IS WITHOUT MERIT**

8

9    In claim three, petitioner contends that the cumulative errors were prejudicial.  This claim

10   is without merit because petitioner has failed to show that the state appellate court made an

11   objectively unreasonable application of clearly established United States Supreme Court precedent

12   or that the state appellate court decision was based upon an unreasonable determination of facts.

13   The Court of Appeal implicitly rejected this claim of aggregated error without expressly

14   addressing it because there were no errors and no showing that petitioner suffered prejudice.  Exh.

15   F.  As explained above in regard to petitioner's previous claims, petitioner has failed to show that

16   there were errors and to show that he suffered prejudice.  Petitioner has, therefore, failed to

17   demonstrate that the state appellate court decision was contrary to clearly established federal law

18   or that the state appellate court decision was based upon an unreasonable determination of facts.

19   But even if there were error, the cumulative effect would not have had a substantial and

20   injurious effect on the jury's determination.  The evidence overwhelmingly showed that petitioner

21   flagged down a taxicab, got out, used a knife to confront the driver and take the taxicab, ran down

22   the driver, and drove away.  Even if the victim's statement to the police identifying petitioner as the

23   thief were inadmissible, his statement to Mr. Logan was.  And a mini-trial about the reasons for

24   petitioner's going behind a parked car when a police car drove by would not have changed the result.

25   Under the *Brecht* standard, any cumulative error was harmless because it did not have a substantial

26   influence in determining petitioner's guilt.  The jury's decision would have been the same.

27   ///

28

1

**CONCLUSION**

2          Accordingly, for the reasons stated, respondent respectfully requests that the petition be

3   denied with prejudice.

4          Dated:  April 14, 2008

5                                Respectfully submitted,

6                                EDMUND G. BROWN JR.
                                 Attorney General of the State of California

7                                DANE R. GILLETTE
                                 Chief Assistant Attorney General

8
                                 GERALD A. ENGLER
9                                Senior Assistant Attorney General

                                 GREGORY A. OTT
10                               Deputy Attorney General

11                               /s/ Allen R. Crown_____
                                 ALLEN R. CROWN
12                               Deputy Attorney General

13                               Attorneys for Respondent

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3   INTRODUCTION                                                           1

4   STATEMENT OF THE CASE                                                  2

5   STATEMENT OF FACTS                                                     3

6   STANDARD OF REVIEW                                                     7

7   **CLAIM ONE      PETITIONER'S CLAIM OF VIOLATION OF HIS
                RIGHT TO CONFRONTATION IS WITHOUT**

8   **            MERIT**                                                  9

9
    **CLAIM TWO      PETITIONER'S CLAIM OF DENIAL OF HIS RIGHT
                TO PRESENT A DEFENSE IS WITHOUT MERIT**
10                                                                         11

11
    **CLAIM THREE PETITIONER'S CLAIM THAT THE CUMULATIVE
                ERRORS WERE PREJUDICIAL IS WITHOUT**
12  **            MERIT**                                                  12

13  CONCLUSION                                                             13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**Cases**

4 | *Bains v. Cambra*
204 F.3d 964 (9th Cir. 2000) ......... 8

5

*Brecht v. Abrahamson*
6 | 507 U.S. 619 (1993) ......... 8, 10, 12

7 | *Brewer v. Hall*
378 F.3d 952 (9th Cir. 2004) ......... 8

8

*Crane v. Kentucky*
9 | 476 U.S. 683 (1986) ......... 11

10 | *Crawford v. Washington*
541 U.S. 36, 59, n. 9 (2004) ......... 9, 10

11

*Early v. Packer*
12 | __U.S.__,123 S. Ct. 362 (2002) ......... 8

13 | *Early v. Packer*
537 U.S. 3 (2002) ......... 8

14

*Lockyer v. Andrade*
15 | __U.S.__, 123 S. Ct. 1166 (2003) ......... 8

16 | *Lockyer v. Andrade*
538 U.S. 63 (2003) ......... 8

17

*Miller-El v. Cockrell*
18 | 357 U.S. 322 (2003) ......... 8

19 | *Mitchell v. Esparza*
540 U.S. 12 (2003) ......... 8

20

*Penry v. Johnson*
21 | 532 U.S. 782 (2001) ......... 8

22 | *Shackleford v. Hubbard*
234 F.3d 1072, 1079, n. 2 (9th Cir. 2000) ......... 9

23

*United States v. Dhinsa*
24 | 243 F.3d 635 (2d Cir. 2001) ......... 10

25 | *United States v. Emery*
186 F.3d 921 (8th Cir. 1999) ......... 10

26

*United States v. Miller*
27 | 116 F.3d 641 (2d Cir. 1997) ......... 10

28

Memorandum of Points and Authorities in Support of Answer - *Gutierrez v. Yates*, C 07-3668 RMW (PR)

**TABLE OF AUTHORITIES  (continued)**

1

Page

2

3    *United States v. Owens*
484 U.S. 554 (1988)                                          9

4    *United States v. Thevis*
665 F.2d 616 (5th Cir. 1982)                                10
5

6    *Washington v. Texas*
388 U.S. 14 (1967)                                          11

7    *Williams v. Taylor*
529 U.S. 362 (2000)                                          8
8

9    *Woodford v. Visciotti*
__U.S.__, 123 S. Ct. 357 (2002)                             8

10   *Woodford v. Visciotti*
537 U.S. 19 (2002)                                           8

11   *Ylst v. Nunnemaker*
501 U.S. 797 (1991)                                          9
12

13   **Constitutional Provisions**

14   United States Constitution
15        Sixth Amendment                                       11

16   **Statutes**

17   United States Code, Title 28
18        § 2254                                                 8
          § 2254(d)                                              7
19        § 2254(e)(1)                                           8

     California Penal Code
20        § 215                                                  2
          § 245(a)(1)                                            2
21        § 667                                                  2
          § 667.5                                                2
22        § 667.5(a)                                             2
          § 667.5(b)                                             2
23        § 667.5(c)                                             2
          § 1192.7                                               2
24        § 1192.7(c)                                            2
          § 1203(e)(3)                                           2
25        § 12022.7                                              2
          § 12022.7(a)                                           2
26        § 12022(b)(1)                                          2

27

28

**TABLE OF AUTHORITIES  (continued)**

1

**Page**

2

3    **Other Authorities**

4    AEDPA                                                                                    9

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28